FILED
COURT OF APPEALS
DIVISION II

2014 JUN 17 AM 8: 34

STATE OF WASHINGTON
BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| RAYNA MATTSON, | No. 43735-0-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| AMERICAN PETROLEUM ENVIRONMENTAL SERVICES, INC.; BERND STADTHERR and JANE DOE STADTHERR, | |
| Respondents. | |

BJORGEN, A.C.J. — Rayna Mattson sued American Petroleum Environmental Services (APES) and Bernd Stadtherr, an APES employee, claiming that they negligently caused her car accident by spilling oil on an interstate freeway. Ultimately, a jury found no negligence by Stadtherr or APES. Mattson appeals, arguing (1) that the trial court erred in denying her motions for judgment as a matter of law or a new trial on liability because there was "undisputed" evidence as to APES's negligence, and (2) that other irregularities require a new trial, including (a) the trial court's refusal to apply res judicata or various forms of estoppel to prevent APES from litigating causation during the trial on APES's and Stadtherr's liability, (b) multiple instructional errors, (c) misconduct by APES's counsel, (d) juror misconduct, and (e) cumulative error. We disagree and affirm.

## FACTS

APES collects and reprocesses waste oil for reuse. Its operators, like Stadtherr, drive tanker trucks to sites where used oil is located, collect the oil, and then return it to APES's

facility for recycling.

In July 2003, APES assigned Stadtherr to return a shipment of waste oil from Canada. Before setting out, Stadtherr followed his normal pre-trip routine and performed a federally mandated pre-trip inspection to ensure that everything on the truck was in proper working condition. As part of his inspection, Stadtherr verified that properly functioning bungee cords secured the vacuum hoses used to collect the oil in their housings.

After finishing his inspection, Stadtherr left APES's facility near the Port of Tacoma and proceeded north on Interstate 5 (I-5). Before Stadtherr reached Federal Way, he noticed that one of the vacuum hoses had come loose and was dragging behind the truck. The hose had not dragged for very long; truck drivers must check their rear view mirrors every 15 to 20 seconds and Stadtherr had not seen the hose in his last check in the mirror. Stadtherr pulled over to the side of the road and discovered that contact with the road and the truck's tires had split the hose open.

Mattson was also driving northbound on I-5 just after Stadtherr. A slick substance on the freeway caused Mattson's tires to lose their grip, and she lost control of her car. She spun around several times, careened off the interstate, and rolled down the embankment at the side of the road, flipping several times before stopping.

A Washington State Patrol trooper responded to the scene of Mattson's accident and noticed a significant amount of liquid on the roadway. The trooper summoned the Department of Transportation to clean up the slick, which was made of a "slippery kind of substance" and extended "[m]ore than a football field" on I-5. Clerk's Papers (CP) at 1572, 1578. The trooper also summoned another state patrol unit to contact Stadtherr, who had stopped his truck on the

side of the road a short distance away, on the assumption that Stadtherr's truck had a connection to the accident. The troopers later cited Stadtherr for causing the accident.

Mattson sued APES and Stadtherr and his marital community, alleging that they had negligently allowed oil to spill onto the freeway, causing the accident and her resulting injuries.

The parties exchanged cross motions for summary judgment before trial. Mattson first sought judgment that APES and Stadtherr had negligently caused her accident. Mattson's second motion sought judgment that her accident had proximately caused her injuries and that her claims of damages from those injuries were reasonable. APES sought summary judgment on the ground that it had not breached its duty of care. For purposes of deciding these various motions, APES asked the court to consider as true Mattson's argument that APES had spilled the oil that caused her accident.

The trial court granted Mattson's motions for summary judgment. The court found APES and Stadtherr jointly and severally liable for the automobile accident based on common law negligence and for all Mattson's injuries proximately caused by the accident. The trial court also found that the collision caused Mattson's injuries, that she bore no comparative fault for the accident, and that her damages claims were reasonable. The trial court ordered a trial "solely on the issue of the nature and extent of the damages proximately caused to the Plaintiff as a result of the Defendants' negligence" and instructed the jury that, regardless of their verdict on other damages, the court had determined she had suffered $109,645.40 in medical costs, lost wages, and other expenses. CP at 570, 574. After the trial on damages, the jury returned a verdict for Mattson in excess of $500,000.00.

APES appealed. It assigned error to the trial court's order "granting Respondent Rayna Mattson's motion for partial summary judgment on liability." CP at 671. APES contended that "material issues of fact remain regarding APES's negligence and the proximate cause of this accident" and that the trial court erred by determining that APES was negligent under traditional or res ipsa loquitor theories of negligence. CP at 671.

On appeal, we agreed with APES and reversed summary judgment on liability, "because ... genuine issues of material fact remained as to whether [APES and Stadtherr] breached a duty of care and, if so, whether that breach proximately caused the accident." CP at 589. Consequently, we remanded for trial on the issue of APES's and Stadtherr's liability.

On remand, the parties tried the issue of liability before a jury.[1] The jury found that APES and Stadtherr had not acted negligently and therefore returned no verdict with regard to causation. Mattson sought post-verdict relief, including judgment as a matter of law under CR 50 and the grant of a new trial under CR 59, but the trial court denied these motions. Mattson now appeals.

## ANALYSIS

I. MOTION FOR JUDGMENT AS A MATTER OF LAW AND ALTERNATIVE MOTION FOR NEW TRIAL

At the close of evidence and after the verdict, Mattson moved for judgment as a matter of law and, alternatively, for a new trial, based on the "unrebutted and undisputed evidence [of APES's and Stadtherr's negligence] . . . presented at [the] time of trial." Br. of Appellant at 48;

---

[1] Due to the number and variety of issues raised in this appeal, we set the relevant facts out below while analyzing Mattson's claims of error.

4

CP at 2595-2606, 2716-62. The trial court denied these motions.[2] Despite Mattson's

characterization, the record contains conflicting evidence that created material issues of fact.

Consequently, the trial court did not err when it sent the negligence question to the jury and

denied Mattson's post-verdict motions for relief.

A.      Standard of Review and Principles of Negligence

We review de novo a trial court's denial of a motion for judgment as a matter of law

under CR 50. *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 530-31, 70 P.3d 126 (2003). Judgment

as a matter of law is appropriate if, after "'viewing the evidence most favorable to the

nonmoving party, the court can say, as a matter of law, there is no substantial evidence or

reasonable inference to sustain a verdict for the nonmoving party.'" *Davis*, 149 Wn.2d at 531

(quoting *Sing v. John L. Scott, Inc.*, 134 Wn.2d 24, 29, 948 P.2d 816 (1997)). Mattson must

· accept as true all evidence APES offered and any inferences reasonably drawn from that

evidence for purposes of searching for this substantial supporting evidence. *Goodman v.*

*Goodman*, 128 Wn.2d 366, 371, 907 P.2d 290 (1995). Substantial evidence in support of the

jury's verdict is "evidence 'sufficient . . . to persuade a fair-minded, rational person'" that APES

and Stadtherr did not breach their duty of care. *Davis*, 149 Wn.2d at 531 (quoting *Helman v.*

*Sacred Heart Hosp.*, 62 Wn.2d 136, 147, 381 P.2d 605 (1963)) (alteration in original).

---

[2] On appeal, Mattson assigns error to the denial of her motion for judgment as a matter of law, but does not specifically assign error to the denial of her motion for a new trial. Nevertheless, her briefing adequately presents each of these related challenges and the record is sufficient to review each. Accordingly, we review both challenges consistently with *State v. Gower*, 172 Wn. App. 31, 45, 288 P.3d 665 (2012), *overruled on other grounds*, 179 Wn.2d 851, 321 P.3d 1178 (2014) (this court may consider issues raised without formal assignments of error if sufficiently briefed and the record allows review).

We review a trial court's decision to deny a motion for a new trial under CR 59(a) for an abuse of discretion. *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 454, 191 P.3d 879 (2008). A trial court abuses its discretion if it denies a motion for a new trial where the record does not contain substantial evidence to support the verdict. *Palmer v. Jensen*, 132 Wn.2d 193, 197-98, 937 P.2d 597 (1997). We again consider the facts and inferences in the light most favorable to the nonmoving party when reviewing the record for substantial evidence to support a trial court's decision on a CR 59 motion for a new trial. *Hizey v. Carpenter*, 119 Wn.2d 251, 271-72, 830 P.2d 646 (1992).

A person acts negligently by failing "to exercise such care as a reasonable person would exercise under the same or similar circumstances." *Mathis v. Ammon*, 84 Wn. App. 411, 416, 928 P.2d 431 (1997). To prove negligence, a plaintiff must show the existence of a legal duty to exercise ordinary care, breach of that duty, and that the breach proximately caused damages to the plaintiff. *Mathis*, 84 Wn. App. at 415-16. A duty of care may exist by virtue of the common law or a statute. *Mathis*, 84 Wn. App. at 416-17.

Alternatively, in "'peculiar and exceptional cases'" a plaintiff may prove negligence by res ipsa loquitor, which allows the jury to infer negligence without the plaintiff proving specific acts of negligence. *Curtis v. Lein*, 169 Wn.2d 884, 889, 239 P.3d 1078 (2010) (quoting *Tinder v. Nordstrom, Inc.*, 84 Wn. App. 787, 792, 929 P.2d 1209 (1997). To invoke the doctrine of res ipsa loquitor, the plaintiff must show "he or she suffered injury, the cause of which cannot be fully explained, and the injury is of a type that would not ordinarily result if the defendant were not negligent." *Pacheco v. Ames*, 149 Wn.2d 431, 436, 69 P.3d 324 (2003). To satisfy these requirements, the plaintiff must show that

(1) the accident or occurrence that caused the plaintiff's injury would not ordinarily happen in the absence of negligence, (2) the instrumentality or agency that caused the plaintiff's injury was in the exclusive control of the defendant, and (3) the plaintiff did not contribute to the accident or occurrence.

*Lein*, 169 Wn.2d at 891.

B.    Evidence of Negligence

We begin by acknowledging that Mattson presented significant evidence of negligent conduct by APES and Stadtherr. Mattson's expert, Christopher Ferrone, testified that APES and Stadtherr breached statutory duties requiring them to prevent their cargo or load from "leaking, spilling, blowing or falling from" the tanker truck. Verbatim Report of Proceedings (VRP)(Mar. 28, 2012) at 505. Ferrone further stated that the measures APES and Stadtherr took to secure the hose on their truck failed to satisfy their common law duty to exercise ordinary care. Ferrone opined that "ultimately . . . the oil [causing the accident] is related to this truck as a result of the hose becoming detached or partially detached . . . and being run over by its own wheels, and as a consequence putting that oil onto the pavement." VRP (Mar. 28, 2012) at 511. Ferrone stated also that he saw no evidence that suggested that anything other than APES's leaking hose had caused the collision.

In addition, APES's own personnel and its expert testified in a manner that would have allowed the jury to find a breach of the duty to exercise ordinary care. Both Michael Mazza, APES's owner, and Stadtherr testified that the rough nature of I-5 at the time caused the tanker trucks to bounce violently. Stadtherr testified that this violent bouncing could cause objects secured to the truck to come loose. APES's own expert testified that it was foreseeable that a bungee cord could break while driving a tanker truck on I-5's rough surface. Stadtherr also testified that he saw oil on the tanker truck while inspecting the split hose. Further, Mattson

7

impeached both Stadtherr and Mazza with deposition testimony indicating that they had accepted responsibility for Mattson's accident.

However, APES and Stadtherr also introduced evidence that they had complied with their common law standard of care. Mazza testified that APES required its drivers to inspect the bungee cords to ensure their proper function, and Stadtherr testified that he had done so on the day of the incident. Mazza and Stadtherr both testified that other companies in the oil transport industry commonly used bungee cords for similar purposes. Stadtherr testified that when bungee cords looked worn during his inspection, he would replace them before they broke, allowing the jury to infer he would have done so if the cord at issue had appeared frayed or unsuitable. Both Stadtherr and Mazza testified that they had never seen a bungee cord break while in motion. Both testified that other than the day in question they had only seen bungee cords break while being stretched to strap down the hoses.

Further, APES and Stadtherr introduced evidence indicating that they had not created the oil slick on the freeway. Although Mattson hotly disputed the testimony, Mazza denied that the tanker truck carried oil; instead, he contended it carried only residual wastewater and could not have spilled oil. Mazza went to where troopers had stopped Stadtherr the day of the accident and testified that he saw no oil behind the truck. A witness testified that the slick smelled of diesel, and APES introduced evidence that such material could not have come from its truck. Finally, observers described a slick extending over 200 feet in length. APES introduced evidence that it could not have dropped the volume of material comprising the slick with its broken hose, which was vacuum sealed at both ends and contained only a minimum of residual material.

APES also introduced evidence that it had complied with its statutory duties of care. Lewis testified that any residual oil spilled by the tearing of the vacuum hose would not fall within the ambit of the regulations Mattson cited as a basis for duties of care. Lewis also testified that Stadtherr's pre-trip inspection, which confirmed that the bungee cords appeared in satisfactory condition, meant that APES had not violated any federal regulations. Finally, Lewis opined that Stadtherr's pre-trip inspection and his and Mazza's actions after the hose came loose also meant that Stadtherr and APES complied with applicable state law.

With regard to Mattson's common law negligence and res ipsa loquitor claims, APES and Stadtherr introduced substantial evidence that they had exercised ordinary care.[3] While Mattson's brief admirably summarizes the evidence supporting a conclusion that Stadtherr and APES acted unreasonably, our role is not to reweigh the evidence. Instead we look to the evidence presented by APES, which Mattson must accept as true for her challenges. Stadtherr testified that he performed the required pre-trip inspection and, in so doing, made sure the bungee cords were in satisfactory condition. Stadtherr testified that when bungee cords looked worn during his inspection, he would replace them before they broke. Both Stadtherr and Mazza testified that they had only seen a bungee cord break while being stretched to strap down the hoses, and never seen a cord break while the truck was moving. Both also testified that the use of bungee cords was common in their industry. Although the court did not instruct the jury that industry practice could show ordinary care, the jury could have inferred that Stadtherr and APES acted reasonably from this testimony.

---

[3] Res ipsa loquitor allows the inference of negligence, meaning the failure to exercise ordinary care. To the extent that APES's evidence shows it exercised ordinary care, it allowed the jury to decline to infer negligence.

All this evidence allowed the jury to find APES and Stadtherr had acted reasonably despite the breaking of the bungee cord. *See Brotherton v. Day & Night Fuel Co.*, 192 Wash. 362, 375-78, 73 P.2d 788 (1937) (no negligence when accident caused by mechanical failure); *Adams v. W. Host, Inc.*, 55 Wn. App. 601, 606, 779 P.2d 281 (1989) ("[m]aterials can wear out or break without negligence being involved"). This evidence, along with the evidence indicating that APES had not dropped the oil that caused Mattson's crash, would also defeat Mattson's claim that she is entitled to judgment as a matter of law under res ipsa loquitur.

With regard to Mattson's claim that APES and Stadtherr acted negligently by violating federal regulations, APES introduced substantial evidence that it complied with its statutory duties. Lewis testified any oil spilling from the torn hose would not violate any of the statutes Mattson cited. Further, Lewis testified that APES and Stadtherr had satisfied all their statutory duties with the pre-trip inspection and their post-accident conduct. While Mattson's expert testified differently, we defer to the jury's resolution of competing testimony. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). The testimony elicited by APES allowed the jury to return a verdict that APES and Stadtherr had not committed negligence through the breach of a statute.

Finally, APES and Stadtherr introduced evidence indicating that they had not created the oil slick on the freeway because of the volume and nature of the substance on the freeway. First, observers described a slick extending over 200 feet in length and APES introduced evidence that it could not have dropped that much material because the broken hose contained only a minimum of residual material. Further, although Mattson hotly disputed the testimony, Mazza denied that the tanker truck carried oil; instead, he contended it carried only residual wastewater and could

10

not have spilled oil. Finally, Mazza went to where troopers had stopped Stadtherr the day of the accident and testified that he saw no oil behind the truck. This evidence precluded judgment as a matter of law on any of Mattson's theories of negligence: if the oil was not APES's, APES was not negligent.

Substantial evidence supports the jury's verdict. Therefore, the court did not err in denying Mattson's motions under CR 50 and CR 59.

## II. EQUITABLE DOCTRINES

Mattson next contends that the trial court erred in refusing to preclude or estop APES from arguing that the substance it spilled onto the highway did not proximately cause her accident. We disagree.

During the summary judgment proceedings before the first trial, APES asked the court to assume, for purposes of the motions before it, that APES had dropped the oil that had caused Mattson's accident on the freeway. After the trial court granted summary judgment on liability to Mattson, APES appealed. It assigned error to the trial court's resolving breach and causation as a matter of law. In an unpublished opinion we reversed the order of summary judgment on these bases.

Before the second trial, Mattson brought a motion in limine to exclude argument about whether oil spilled by APES caused Mattson's accident.[4] The trial court denied Mattson's

---

[4] Mattson's briefing claims that the trial court denied her "the opportunity to have her motion heard" because the trial court told her initially to bring the motion as one in limine and then later told her she needed to bring it as a motion for summary judgment. Br. of Appellant at 57. This mischaracterizes the record. The trial court denied Mattson the chance to raise the issue as a summary judgment motion because she failed to make the motion in a timely manner, but nevertheless devoted significant time to hearing her motion in limine and denied the motion on the merits.

11

motion, adopting APES's argument, which it paraphrased when first discussing the issue:

> In the prior summary judgment motion the issue came up, and the plaintiffs said for the purposes of – excuse me – defendant said for the purposes of this summary judgment motion only we're going to stipulate that there was oil on the road from the truck.
>
> But of course, we're not in that summary judgment now is their contention; and therefore, the burden of proof is on the plaintiffs to prove that the oil – if there was oil on the road, that this oil is the causation for the ultimate damages done to the plaintiff.

VRP (Mar. 21, 2012) at 7, 17-19; VRP (Mar. 22, 2012) at 129-30. As noted, APES introduced evidence at trial indicating that it had not dropped the oil that caused Mattson's accident.

We review de novo the applicability of collateral estoppel or res judicata. *Christensen v. Grant County Hosp. Dist. No. 1*, 152 Wn.2d 299, 305, 96 P.3d 957 (2004); *Atl. Cas. Ins. Co. v. Or. Mut. Ins. Co.*, 137 Wn. App. 296, 302, 153 P.3d 211 (2007). We review a trial court's refusal to apply the doctrines of equitable or judicial estoppel for an abuse of discretion. *Afinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 860, 281 P.3d 289 (2012); *Ford v. Bellingham-Whatcom County Dist. Bd. of Health*, 16 Wn. App. 709, 715, 558 P.2d 821 (1977).

A.     Res Judicata

The doctrine of res judicata governs "the various ways in which a judgment in one action will have a binding effect in another." *Hilltop Terrace Homeowner's Ass'n v. Island County*, 126 Wn.2d 22, 30, 891 P.2d 29 (1995) (citation omitted). Res judicata bars relitigation of claims already decided, meaning litigated to a judgment on the merits. *Hilltop Terrace*, 126 Wn.2d at 31; *DeYoung v. Cenex Ltd.*, 100 Wn. App. 885, 891-92, 1 P.3d 587 (2000). We determine whether a court has already decided a claim by examining whether the current and past actions share an "'identity of (1) subject matter; (2) cause of action; (3) persons and parties; and (4) the quality of the persons for or against whom the claim is made.'" *Schroeder v. Excelsior Mgmt.*

*Grp., LLC*, 177 Wn.2d 94, 108, 297 P.3d 677 (2013) (quoting *Mellor v. Chamberlin*, 100 Wn.2d 643, 645-46, 673 P.2d 610 (1983)).

Res judicata applies to entire claims or affirmative defenses rather than to determinations about issues. *Luisi Truck Lines, Inc. v. Wash. Utils. & Transp. Comm'n*, 72 Wn.2d 887, 894, 435 P.2d 654 (1967) ("[t]he doctrine of res judicata is intended to prevent relitigation of an entire cause of action and collateral estoppel is intended to prevent retrial of one or more of the crucial issues or determinative facts determined in previous litigation."). Mattson's claim concerns causation, an element of a cause of action for negligence. We therefore analyze Mattson's argument under the doctrine of collateral estoppel rather than res judicata.[5]

B.      Collateral Estoppel

Collateral estoppel bars relitigation of issues finally determined in one action in later proceedings. *Christensen*, 152 Wn.2d at 306. To successfully assert collateral estoppel to bar an opponent from relitigating an issue, a party must show

> (1) the issue decided in the earlier proceeding was identical to the issue presented in the later proceeding, (2) the earlier proceeding ended in a judgment on the merits, (3) the party against whom collateral estoppel is asserted was a party to, or in privity with a party to, the earlier proceeding, and (4) application of collateral estoppel does not work an injustice on the party against whom it is applied.

*Christensen*, 152 Wn.2d at 307.

However, a judgment loses its preclusive effect if it "is vacated or reversed." 14A KARL B. TEGLAND, WASHINGTON PRACTICE: CIVIL PROCEDURE § 35:23, at 519, § 35:34, at 557 (2d ed. 2009). We reversed the summary judgment on which Mattson bases her claims of preclusion in

---

[5] Even if we did consider Mattson's res judicata claim, we would have to reject it for the same reason we reject her collateral estoppel claim. As discussed below, our vacation of the summary judgment order nullified any preclusive effect it had and res judicata did not apply.

an unpublished decision and remanded for trial on the issue of liability. Liability encompasses breach of a duty, but-for causation, and legal causation. *See Mohr v. Grantham*, 172 Wn.2d 844, 850, 262 P.3d 490 (2011) (citing *Harbeson v. Parke-Davis, Inc.*, 98 Wn.2d 460, 475-76, 656 P.2d 483 (1983)). Therefore, collateral estoppel does not bar APES from contesting the causation issue.

C.     Judicial Estoppel

Judicial estoppel prevents "'a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position.'" *Afinson*, 174 Wn.2d at 861 (quoting *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538, 160 P.3d 13 (2007)). Before applying the doctrine to estop a party from asserting a position at trial, a trial court must consider

> (1) whether the party's later position is "clearly inconsistent with its earlier position," (2) whether acceptance of the later inconsistent position "would create the perception that either the first or the second court was misled," and (3) whether the assertion of the inconsistent position would create an unfair advantage for the asserting party or an unfair detriment to the opposing party.

*Afinson*, 174 Wn.2d at 861 (quoting *Arkison*, 160 Wn.2d at 538-39).

Mattson also fails to satisfy any of the elements of a judicial estoppel claim. As the trial court recognized, APES specifically limited the concession at issue. It asked the court to assume the oil causing the spill came from its hose only for purposes of deciding the two motions for summary judgment. Arguing causation on remand is not inconsistent with that limited concession. Additionally, we cannot say that any of the courts involved, the first trial court, our court, or the trial court on remand, were misled. No reasonable person reading the concession would believe it went beyond its limited scope, especially since APES denied causation in its answer. Finally, Mattson should have understood that APES would contest causation on remand,

given its statements and the instructions in our mandate. APES obtained no unfair advantage, and the trial court did not abuse its discretion in declining to estop APES from arguing causation.

D.    Equitable Estoppel

Mattson also invokes the doctrine of equitable estoppel. This doctrine applies where (1) a party makes "an admission, statement, or act inconsistent with a claim later asserted," (2) another party reasonably relies on that admission, statement, or act, and (3) "injury to the relying party" results "if the court permits the first party to contradict or repudiate the admission, statement or act." *Schroeder*, 177 Wn.2d at 108-09.

Mattson fails to satisfy any of the elements of equitable estoppel. After denying it had caused Mattson's accident in its complaint, APES asked the trial court to accept as true Mattson's claim that the ruptured hose spilled the oil that caused her accident for purposes of the motions for summary judgment. As the trial court recognized, APES's concession, by its explicit terms, did not exist outside of the trial court's consideration of the summary judgment motions. APES, therefore, did not take an inconsistent position when it contested causation on remand. Further, Mattson could not have reasonably relied on APES's representation given that the terms of that representation warned her that APES could contest causation in other contexts. Finally, APES is not repudiating its earlier representation. Again, APES asked the trial court to accept Mattson's claim as true for a limited set of circumstances no longer applicable at the end of the summary judgment proceedings. The trial court did not abuse its discretion in declining to equitably estop APES from arguing causation.

15

### III. JURY INSTRUCTIONS

Mattson next contends that the trial court erred in its instructions to the jury. She raises six arguments in this regard: (1) the court's jury instruction 16 misstated the law concerning negligence through violation of a statute, (2) jury instruction 16 conflicted with the instruction on res ipsa loquitur, (3) the trial court erred in declining to instruct the jury on APES's nondelegable duties under federal law, (4) the court erred in refusing to instruct the jury that it should consider only the fault of APES and Stadtherr when deliberating, (5) the trial court erred in failing to give a spoliation instruction, and (6) the trial court erred in refusing to instruct the jury that it had determined APES had committed negligence as a matter of law under the doctrine of res ipsa loquitur. We find no error.

We apply two different standards of review to challenges to jury instructions. We review a trial court's decision on the specific wording of jury instructions or a trial court's refusal to give an instruction for an abuse of discretion. *Hue v. Farmboy Spray Co.*, 127 Wn.2d 67, 92 n.23, 896 P.2d 682 (1995); *Goodman v. Boeing Co.*, 75 Wn. App. 60, 68, 877 P.2d 703 (1994). We review instructions de novo for errors of law. *Afinson*, 174 Wn.2d at 860. Instructions are insufficient, and therefore legally erroneous, if they prevent the parties from arguing their theories of the case, mislead the jury, or, when taken as a whole, fail to properly inform the jury of the applicable law. *Afinson*, 174 Wn.2d at 860.

A.    Jury Instruction 16: Violation of Statute

Mattson maintains that the trial court erred in giving its instruction 16 instead of her proposed instruction 22 regarding the violation of a statute or regulation. Mattson alleges that

the instruction given contained a "poison pill" that the evidence at trial did not support, rendering it legally erroneous. Br. of Appellant at 67. We disagree.

Plaintiff's proposed instruction 22 provided that "[t]he violation, if any, of a statute, ordinance, administrative code, or Federal Regulation is not necessarily negligence, but may be considered by you as evidence in determining negligence." CP at 1204. This instruction consisted of the standard language from the civil pattern jury instructions. *See* 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 60.03, at 499 (6th ed. 2012).

Based on APES's proposed jury instructions, the trial court instead gave instruction 16, which contained all of the language in plaintiff's proposed instruction 22, but included the optional language from the pattern instruction. The instruction read:

> The violation, if any, of a statute or regulation is not necessarily negligence, but may be considered by you as evidence in determining negligence.
> Such a violation may be excused if it is due to some cause beyond the violator's control, and that ordinary care could not have guarded against.

CP at 2645; *see* 6 WASHINGTON PRACTICE, *supra*, § 60.03, at 499.

Both Mattson's proposed instruction and the instruction given by the trial court concerned the former doctrine of negligence per se. Prior to 1986, a plaintiff could show negligence by demonstrating a statutory violation, since the common law considered statutory breaches conclusive evidence of negligence. *See Mathis*, 84 Wn. App. at 416-17. In 1986 the legislature, with exceptions not relevant here, abolished the doctrine of negligence per se and provided that a statutory breach served as evidence of negligence, rather than conclusive proof of it. LAWS OF 1986, ch. 305, § 910, *codified as* RCW 5.40.050.

We described the "practical effect of RCW 5.40.050" as

17

> eliminat[ing] what might be called the 'strict liability' character of statutory violations under the old negligence per se doctrine, but . . . allow[ing] a jury to weigh the violation, along with other relevant factors, in reaching its ultimate determination of liability.

*Doss v. ITT Rayonier, Inc.*, 60 Wn. App. 125, 129-30, 803 P.2d 4 (1991). While weighing these factors, "the trier of fact may find a statutory violation is not negligence where the violation is due to some cause beyond the violator's control, and ordinary care could not have guarded against the violation." *Hansen v. Friend*, 118 Wn.2d 476, 483, 824 P.2d 483 (1992). Stated otherwise, the jury must determine whether the defendant, despite the statutory violation, exercised ordinary care. *Mathis*, 84 Wn. App. at 419. The optional language in the pattern instruction reflects this question. *See* 6 WASHINGTON PRACTICE, *supra*, § 60.03, at 499.

Mattson argues that the trial court erred because APES could not meet the requirement that the "violation be due to 'some cause beyond the violator's control.'" Br. of Appellant at 67. She argues, in effect, that only emergency situations render the full text of the pattern instruction appropriate, citing commentary in the pattern instructions and *Hood v. Williamson*, 7 Wn. App. 355, 362, 499 P.2d 68 (1972) ("[t]he most common instance where a violation of a statute has been held to be due to a cause beyond the violator's control, which reasonable prudence could not have guarded against, is where the violation is excused by an emergency."). While Mattson is correct that an emergency is the most common reason for finding a statutory violation beyond the violator's control, the fact that it is the most common demonstrates that an emergency is not the exclusive reason for finding a violation beyond the violator's control.

APES and Stadtherr introduced evidence that supported an argument that the failure of the bungee cord was beyond their control. This evidence included Lewis's testimony about APES's and Stadtherr's compliance with federal and state regulations, Stadtherr's testimony that

he inspected the bungee cord and that it appeared in good working condition, his testimony that he would replace bungee cords that did not appear to be in good working condition, and the testimony from both Stadtherr and Mazza that they had never seen a bungee cord break while in motion. From this the jury could infer that Stadtherr exercised ordinary care and that the breaking of the bungee cord was a simple mechanical failure that could occur "without any fault on the part of the person in charge of the vehicle." *Brotherton*, 192 Wash. at 375. With this evidence, the trial court was required to give the optional language in the instruction regarding a violation beyond the control of APES and Stadtherr so they could argue their theory of the case. *Afinson*, 174 Wn.2d at 860.

We find no error in the trial court's decision to use the full pattern instruction.

B.      Conflict between Instruction 16 and Res Ipsa Loquitur Instruction 12

Mattson also contends that instruction 16 contradicted instruction 12, the res ipsa loquitur instruction, and negated the jury's ability to apply res ipsa loquitur to her claim. We disagree.

As set out above, instruction 16 provided:

> The violation, if any, of a statute or regulation is not necessarily negligence, but may be considered by you as evidence in determining negligence.
> Such a violation may be excused if it is due to some cause beyond the violator's control, and that ordinary care could not have guarded against.

CP at 2645. Instruction 12 provided:

> If you find that:
>      (1) the collision in this case is of a kind that ordinarily does not happen in the absence of someone's negligence; and
>      (2) the collision was caused by an agency or instrumentality within the exclusive control of the defendant(s);
> then, in the absence of satisfactory explanation, you may infer, but you are not required to infer, that the defendant(s) were negligent.

CP at 2614.

19

No. 43735-0-II

Mattson alleges that the language added to instruction 16 at APES's request negated the jury's ability to find negligence under res ipsa loquitur. She cites two cases in support of her contention that the court erred by giving irreconcilable instructions, *Galvan v. Prosser Packers, Inc.*, 83 Wn.2d 690, 521 P.2d 929 (1974) and *Hall v. Corporation of Catholic Archbishop of Seattle*, 80 Wn.2d 797, 498 P.2d 844 (1972). Neither supports her claim.

In *Galvan*, a negligence and products liability case, the court gave an instruction on the manufacturer's liability, which depended partly on the defective product proximately causing the plaintiff's injury. 83 Wn.2d at 691-93. The only definition of proximate cause came in the court's general instructions on negligence. *Galvan*, 83 Wn.2d at 693. The *Galvan* court held the trial court erred because foreseeability meant different things in negligence and strict liability claims and the general negligence instruction defined "foreseeability in the context of strict liability in too broad a sense." *Galvan*, 83 Wn.2d at 693. Because the jury would have used the broad general negligence definition of foreseeability to evaluate the products liability claim, the *Galvan* court held that the trial court gave inconsistent and prejudicial instructions.

In *Hall*, a negligence and negligence per se suit, the trial court instructed the jury that the breach of a statute was negligence, and instructed it that negligence per se "ha[d] the same effect as any other act of negligence." 80 Wn.2d at 803. A related instruction informed the jury that the Seattle building code imposed certain statutory duties on landowners. *Hall*, 80 Wn.2d at 798. However, a fourth instruction, given in the context of general negligence, informed the jury that a property

> owner is under no duty to reconstruct or alter the premises so as to obviate known and obvious dangers, nor is he liable for injury to an invitee resulting from a danger which was obvious or should have been observed in the exercise of reasonable care.

20

*Hall*, 80 Wn.2d at 803. The court held that the trial court's instruction that the jury should treat general and statutory negligence the same meant that the fourth instruction essentially told the jury to find no liability under the then existing law of negligence per se despite the breach of a statutory duty. *Hall*, 80 Wn.2d at 803. The court reversed based on the contradictory instructions. *Hall*, 80 Wn.2d at 803-04.

Unlike the instructions in *Galvan* and *Hall*, instructions 12 and 16 here do not create an error when read together. Instruction 16 allowed, but did not require, the jury to excuse any statutory violation. It described the circumstances under which the jury could conclude that, despite a statutory violation, APES and Stadtherr had not acted negligently. Similarly, as discussed above, res ipsa loquitur allows, but does not require, an inference of negligence. Instruction 12 properly described the circumstances where the jury could conclude that Mattson's accident spoke for itself in terms of showing APES's and Stadtherr's negligence. The jury could freely conclude that APES and Stadtherr were negligent under one theory and not the other, negligent under both, or not negligent under either. There is no conflict between the instructions.

C.      Proposed Instruction 14:  Nondelegable Duty

Mattson next contends that the trial court erred by refusing to give her proposed instruction 14. That instruction would have informed the jury that federal regulations imposed a nondelegable duty requiring APES to prevent its "load or cargo" from "drop[ping], spill[ing], or leak[ing] . . . on the roadway." CP at 1196.

Mattson offers no reason why the trial court abused its discretion in failing to give this instruction other than stating that testimony supported it. While witnesses did testify about the

nondelegable nature of the duty, APES did not contest the issue and giving the instruction would therefore have constituted error. *State v. Fernandez*, 29 Wn. App. 278, 281, 628 P.2d 827 (1981) (trial court errs by giving an instruction on an undisputed issue). Further, we consider the sufficiency of jury instructions as a whole. Instructions 13 through 19 spoke of the duties owed in driving or securing loads on a vehicle. Instruction 4 informed the jury that the law of agency imputed any breach of these duties by Stadtherr to APES. The jury instructions as a whole allowed Mattson to argue her theory of nondelegability, and the trial court did not abuse its discretion in declining to give proposed instruction 14.

D.     Instruction 5: Fault of Other Entities

Mattson next alleges that the trial court erred in giving its instruction 5 in the place of her proposed instruction 3A. These instructions concerned the fault of entities other than the defendants. Mattson contends that the trial court's instruction allowed APES to impermissibly argue that some other entity caused Mattson's collision. We find no abuse of discretion in giving instruction 5 and declining to give Mattson's proposed instruction.

As discussed, Mattson argued that the trial court should prevent APES and Stadtherr from contesting that oil it spilled had caused her accident on remand. The trial court, however, refused to preclude or estop APES and Stadtherr from doing so. Mattson then moved to restrict APES's ability to argue causation in other ways. She moved in limine for an order stating that "[i]t is ORDERED, ADJUDGED, AND DECREED that the Plaintiff's motion to preclude any argument, reference, or insinuation regarding any comparative fault of the Plaintiff or any other third party apart from the named Defendant's shall be and is hereby GRANTED." CP at 1460.

22

When the parties met with the trial court to discuss the motions in limine, APES and Stadtherr objected to Mattson's motion for fear that it would foreclose their ability to argue they were not at fault, resulting in the following exchange:

> [Mattson's counsel]: Your honor, there's no evidence that there are any other unnamed parties. I don't even believe they pled that. I have to look up their answer. That's never been an issue.
> And that's the whole point is that, oh, well, there's this other random person that could be responsible for this collision. You don't get to bring that up the day before trial. That's –
> [APES's counsel]: It's not the day before trial. If we didn't leave a 200-foot diesel black oil slick on the roadway, somebody did.
> [Mattson's counsel]: It's either that they're negligent or they're not. That's what it comes down to. They don't get to point to an absent person.
> And again, we're getting back into the speculation [about other causal actors], and this is the whole reason [for the motion in limine.]
> [APES's counsel]: It's not pointing to an absent person to say that we didn't do it, and if it's there somebody else did it. I mean, that's not pointing to the fault of an unnamed party.
> [Mattson's counsel]: Not only that, Your Honor. The rule actually requires you name a specific unnamed party. They haven't done that. There isn't anybody else. This is – and I move to dismiss any claim that they're going to attempt to make right now.
> [The Court]: Well, that's not their point. At least that's not what I heard arguing. We're back to where you were before.
> [APES's counsel]: Exactly. I just don't want to be foreclosed by this from you exercising your discretion as the evidence comes in.
> [The Court]: Right.

VRP at 119-21. The trial court modified Mattson's proposed order so that it proscribed "argument, reference, or insinuation regarding any comparative fault of the Plaintiff or any other *named* third party apart from the named Defendants." CP at 1460 (emphasis added).[6]

---

[6] Mattson's brief repeatedly quotes the language of the trial court's order, but modifies it so that it reads "[un]named" instead of "named." Br. of Appellant at 78, 93 n.20; CP at 1460. The trial court used "named" in the order quite deliberately and there is no reading of the record that renders Mattson's alteration faithful to what happened at trial.

Based on her proposed order on the motion in limine, Mattson's proposed instruction 3A read:

> You are instructed that the Court has determined that Plaintiff is not in any way at fault for this collision, nor are there any unnamed parties that are in any way responsible for this collision, and therefore, you are not to consider the fault of anyone other than the named Defendants in determining your verdict in this case.

CP at 1440. Given its ruling in limine, the trial court instead gave its instruction 5, which provided only that "[y]ou are instructed that the Court has determined that Plaintiff is not in any way at fault for this collision." CP at 2634.

Mattson claims that the failure to give proposed instruction 3A constituted error because it left her unable to argue that no other entity could have caused her accident, meaning the jury instructions prevented her from arguing her theory of the case. Mattson analogizes her case to *Izett v. Walker*, 67 Wn.2d 903, 410 P.2d 802 (1966). This analogy, however, is not sound.

In *Izett* the plaintiff made an emergency stop; the defendant failed to do so and rear-ended the plaintiff. 67 Wn.2d at 904-06. The trial court found the defendant negligent as a matter of law and, based on this finding, refused to instruct the jury, in accordance with the plaintiff's request, that the defendant was negligent because the law required following drivers to maintain sufficient distance in case of an emergency stop. *Izett*, 67 Wn.2d at 906-07. The jury returned a verdict for the defendant, apparently based on the plaintiff's contributory negligence in making the emergency stop or because the jury found the plaintiff's emergency stop had proximately caused the accident. *Izett*, 67 Wn.2d at 904, 908. The plaintiff appealed, claiming that the instructions did not allow him to make his case that the defendant was negligent and that he had no comparable fault despite his emergency stop. The *Izett* court agreed and held that the

failure to give the instruction on the defendant's negligence required reversal of the verdict because "without this instruction [on the defendant's statutory duty to follow at a safe distance] the jury could not properly evaluate any claims of contributory negligence and proximate cause on the part of [the plaintiff's] conduct." *Izett*, 67 Wn.2d at 906-07.

This case differs markedly from *Izett*. Unlike the trial court in *Izett*, the trial court here gave the jury the instructions necessary for Mattson to make her case to the jury. The trial court instructed the jury on APES and Stadtherr's common law and statutory duties, the standard of conduct they needed to adhere to in order to satisfy those duties, and proximate cause. These instructions allowed Mattson to argue her theory of the case, that she experienced an injury proximately caused by oil that APES and Stadtherr unreasonably allowed to fall onto I-5. The evidence in connection with the instructions on proximate cause allowed her to argue that APES had caused the accident and that no other entity had done so. Mattson's proposed alternative instruction, on the other hand, directly contradicted the order in limine. The trial court did not err in issuing instruction 5 instead of proposed instruction 3A.

E.     Proposed Instruction 23A: Spoliation

Mattson next argues that the trial court erred in refusing to give a spoliation instruction. She contends that APES's discarding of the broken bungee cord and truck hose, disposing of the truck before she could take pictures of it, and failure to retain the pre- and post-trip reports constituted the willful destruction of evidence and that the trial court should have instructed the jury it could infer APES destroyed evidence damaging to its defense.

25

Turning first to the facts, after the incident Stadtherr put the broken bungee cord in the truck along with the broken hose. A day later, he disposed of both because they were "broken" and "useless." VRP (Apr. 2, 2012) at 869-70; VRP (Mar.29, 2012) at 587.

APES retained the pre- and post-trip reports for several years after the accident. The experts at trial testified that APES had a statutory duty to preserve these reports for some time, although the testimony conflicted as to whether that duty required retention for three or six months. At some point in 2006, APES moved to a paperless file retention system due to office space constraints. APES apparently planned to scan all of its older files to store them electronically before disposing of the physical copies. However, this effort required extensive time and effort and APES abandoned it before scanning the files relevant to Mattson's suit, the 2003 files. By the time Mattson asked for the files, APES had purged them.

The parties contested whether APES knew of Mattson's suit and should therefore have retained the trip logs until the completion of the litigation. Mattson did not file suit until 2006; APES claimed that it had no knowledge of any possible litigation until then. Mattson, however, argued that APES was on notice because it had received a traffic ticket fining it for causing her accident.

In 2007, after filing suit, Mattson asked APES to set up the tanker truck in the configuration used the day of the accident so that she could photograph it. Mazza agreed on behalf of APES. Mattson sent an investigator out to take the photos. Apparently, the investigator was ejected from APES's property after an employee called Mazza to report the incident and Mazza became upset, feeling that this violated the agreement with Mattson. Mazza explained that APES had not prepared the truck and that Mattson's investigator was taking

26

inaccurate photographs. APES sold the truck soon after the incident and before Mattson ever obtained photographs.

At trial, Mattson moved for a spoliation instruction. After hearing significant argument and testimony in and out of the presence of the jury, the trial court declined to give the instruction.

Spoliation entails "the intentional destruction of evidence." *Tavai v. Walmart Stores, Inc.*, 176 Wn. App. 122, 134, 307 P.3d 811 (2013).

> "[W]here relevant evidence which would properly be part of a case is within the control of a party whose interests it would naturally be to produce it and he fails to do so, without satisfactory explanation, the only inference which the finder of fact may draw is that such evidence would be unfavorable to him."

*Tavai*, 176 Wn. App. at 134-35 (quoting *Pier 67, Inc. v. King County*, 89 Wn.2d 379, 385-86, 573 P.2d 2 (1977)). Courts must determine whether to instruct the jury on the unfavorable inference allowed by spoliation based on two factors: "the potential importance or relevance of the missing evidence" and "the culpability or fault of the adverse party." *Tavai*, 176 Wn. App. at 135. We review a trial court's refusal to give a spoliation instruction for an abuse of discretion. *Tavai*, 176 Wn. App. at 135.

The trial court reasonably determined that no spoliation occurred regarding the bungee cord and hose. Courts have repeatedly held that the cumulative or insignificant nature of physical evidence weighs against a finding of spoliation. *Ripley v. Lanzer*, 152 Wn. App. 296, 326, 215 P.3d 1020 (2009) (no spoliation where testimony provides the same information offered by the evidence); *Homeworks Constr., Inc. v. Wells*, 133 Wn. App. 892, 899, 138 P.3d 654 (2006) (testimony providing same information as evidence weighs against a finding of spoliation under the first element). Here, the trial court determined that the physical evidence was

27

cumulative with testimony or, given other factors, insignificant. Stadtherr admitted that the bungee cord had ruptured and allowed the hose to escape its housing. Stadtherr also testified that the hose, after coming loose, had dropped down, torn open on contact with the truck's tires, and dragged behind him while he drove on I-5. Finally, no one took samples from the oil slick on I-5, so examination of the hose would likely not answer the question of whether the oil came from APES's truck.

The trial court reasonably determined that no spoliation occurred with regard to the disposal of the truck. The trial court determined that APES had some culpability for the lost evidence because Mattson had specifically asked for permission to photograph the truck and, while Mattson had not complied with APES's procedures for taking these photos, APES had sold the truck before letting Mattson take the pictures. We agree that APES's decision to sell the truck before Mattson took her pictures is troubling. However, the trial court noted that the plaintiffs had other photos and from them everyone seemed to understand what the truck looked like on the day of the accident. Again, the cumulative nature of the evidence supported the trial court's refusal to give a spoliation instruction.

Finally, the trial court reasonably determined that no spoliation occurred with regard to the pre- and post-trip reports. A party need not show bad faith to establish spoliation under the second spoliation factor, the factor concerned with the culpability of the adverse party. *Wells*, 133 Wn. App. at 900. However, where no bad faith is shown, the second spoliation factor only weighs against a party who violates a duty to preserve the evidence. *Wells*, 133 Wn. App. at 900. The trial court found no culpability on APES's part because it had preserved the reports

28

long after they needed to under federal and state law and had no specific knowledge of any suit filed by Mattson when they disposed of their files. The record supports this determination.

F.      Instruction 12: Res Ipsa Loquitur

Mattson also alleges that the trial court erred by giving instruction 12 instead of her proposed instruction 7. Mattson contends that the evidence entitled her to have the jury instructed "on the doctrine of Res Ipsa Loquitur as a matter of law versus instructing the jury" to apply the doctrine permissibly. Br. of Appellant at 85. Mattson is mistaken.

Mattson's original proposed instruction on res ipsa loquitur read:

> The Court has determined that
>       (1) the accident in this case is of a kind that ordinarily does not happen in the absence of someone's negligence;
>       (2) the accident was caused by an agency or instrumentality within the exclusive control of the defendants; and
>       (3) the accident was not in any way due to an act or omission of the plaintiff;
> Therefore, in the absence of satisfactory explanation, you may infer, but you are not required to infer, that the defendant was negligent.

CP at 1197. The trial court rejected this instruction, and Mattson proposed the alternate res ipsa instruction given by the court as its instruction 12. As noted, this instruction, taken from the pattern instructions read:

> If you find that:
>       (1) the accident in this case is of a kind that ordinarily does not happen in the absence of someone's negligence;
>       (2) the accident was caused by an agency or instrumentality within the exclusive control of the Defendant(s).
>       Then, in the absence of satisfactory explanation, you may infer, but you are not required to infer, that the Defendant(s) were negligent.

CP at 2641; see 6 WASHINGTON PRACTICE, supra, § 22.01, at 255.

The applicability of the doctrine of res ipsa loquitur is a question of law. *Lein*, 169 Wn.2d at 889. As noted, res ipsa loquitur allows the jury to infer negligence where

> (1) the accident or occurrence that caused the plaintiff's injury would not ordinarily happen in the absence of negligence, (2) the instrumentality or agency that caused the plaintiff's injury was in the exclusive control of the defendant, and (3) the plaintiff did not contribute to the accident or occurrence."

*Lein*, 169 Wn.2d at 891.

The trial court's role was to determine whether Mattson met her burden of production on the res ipsa loquitur issue. *See Lein*, 169 Wn.2d at 889. The trial court determined that she did so and gave an instruction on res ipsa loquitur. As discussed above, the evidence did not entitle Mattson to judgment as a matter of law on the issue of negligence. The jury therefore needed to resolve questions of fact and it was for the jury to determine whether Mattson's evidence satisfied her burden of proof. *See Lein*, 169 Wn.2d at 895. Mattson's proposed instruction falsely instructed the jury that the trial court had already determined that the central elements of res ipsa loquitur were met. By giving this instruction the trial court would have impermissibly usurped the jury's function. The trial court's rejection of this invitation was not an abuse of discretion.

## IV. COUNSEL MISCONDUCT

Mattson also alleges that misconduct by defense counsel requires a new trial under CR 59(a). Mattson alleges that APES's counsel made repeated speaking objections, argued that an unnamed party caused Mattson's accident in spite of the court's order in limine, argued about the circumstances of Mattson's retention of an counsel in spite of the court's order in limine, and made an improper comment during closing argument. We find no grounds for reversing the jury's verdict.

30

CR 59(a)(2) allows a "new trial where misconduct of the prevailing party materially affects the substantial rights of the losing party." *Teter v. Deck*, 174 Wn.2d 207, 222, 274 P.3d 336 (2012). Relief based on a counsel misconduct claim requires a showing that "(1) the conduct complained of is misconduct, (2) the misconduct is prejudicial, (3) the moving party objected to the misconduct at trial, and (4) the misconduct was not cured by the court's instructions." *Teter*, 174 Wn.2d at 226. We review a trial court's decision on a motion for a new trial under CR 59(a)(2) for an abuse of discretion. *Teter*, 174 Wn.2d at 222. We apply a specialized test for an abuse of discretion and ask whether the misconduct "has [created] such a feeling of prejudice . . . in the minds of the jury as to prevent a litigant from having a fair trial." *Aluminum Co. of Am. v. Aetna Cas. & Sur. Co.*, 140 Wn.2d 517, 537, 998 P.2d 856 (2000).

A.    Speaking Objections

Mattson first alleges that APES's counsel committed misconduct by repeatedly making speaking objections. We agree, but nonetheless deny Mattson's motion for a new trial because we defer to the trial court's determination that the objections did not prejudice her.

Counsel commits misconduct by attempting to present the jury with inadmissible evidence or impermissible argument. *Teter*, 174 Wn.2d at 223, 224 n.12. Speaking objections can "expos[e] the jury to inadmissible evidence and inappropriate argument" and therefore constitute misconduct. *Teter*, 174 Wn.2d at 224 n.12. APES's counsel repeatedly made speaking objections and the trial court admonished him for doing so.

However, the trial court specifically determined that the speaking objections did not create prejudice sufficient to warrant a new trial. Because the trial court has the best vantage point to evaluate the prejudicial effects of any misconduct, we give deference to its findings

31

concerning prejudice. *Teter*, 174 Wn.2d at 223 (citing *State v. Lord*, 117 Wn.2d 829, 887, 822 P.2d 177 (1991)). Given this deference, and because the speaking objections do not seem to have exposed the jury to any prejudicial and inadmissible evidence, we find no abuse of the trial court's discretion in denying Mattson's motion for a new trial on this basis. *See Teter*, 174 Wn.2d at 223.

B.     Violation of Order on the Motion in Limine About Other Causal Actors

Mattson next claims misconduct through violations of the trial court's order forbidding insinuating fault by third parties in causing Mattson's accident. The trial court allowed the argument Mattson now objects to and we find no misconduct.

Mattson sought an order in limine preventing APES and Stadtherr from arguing they had not caused her accident. As discussed above, the court rejected Mattson's proposed language and instead ordered that the defendants could not argue that "named" third parties caused Mattson's accident, allowing the defendants to argue unnamed third parties had done so. Thus, the explicit terms of the order at issue allowed the argument that Mattson objects to, that APES did not cause the oil slick and so unnamed parties must have done so. There was no misconduct, and the trial court did not abuse its discretion in denying Mattson's motion for a new trial.

C.     Motion in Limine Regarding Mattson's Retention of Her Counsel

Mattson next alleges misconduct through violations of the trial court's order forbidding discussion of the circumstances under which she retained her counsel. Again, the trial court explicitly permitted APES to introduce the argument and evidence Mattson now objects to. Again, we find no misconduct.

Before trial, Mattson sought an order in limine forbidding discussion of the circumstances of her hiring of her counsel. The trial court granted the order, which excluded

> evidence regarding the circumstances surrounding Plaintiff's hiring counsel, including, but not limited to, any professional, business, familial, or friendship relationships between Plaintiff(s) and/or Plaintiffs' witnesses . . . for [the] purposes of trial testimony with the possible exception of [the] spoliation issue outside the presence of the jury.

CP at 1459. Mattson's counsel, in her opening statement, discussed the testimony the jury would hear and the physical evidence it would not have. Specifically, she stated that

> [w]hat you won't have is the ruptured hose because it was thrown away and destroyed by the defendants.
> . . . .
> We won't have the bungee cord that broke because that was never – well, I don't know if it was destroyed or thrown away.
> And one of the other things that you won't have . . . is . . . a pre-trip inspection report. . . . That's been thrown away. We don't have that from the date to show what they did or did not do on that day. And that was destroyed.

VRP (Mar. 28, 2012) at 448. Six sentences into his opening statement, APES's counsel addressed the missing evidence, stating that "after [the] accident almost three years pass until my client was sued. And we'll leave it to your decision as to whether or not that explains why some things we'd dearly like to have for you don't exist." VRP (Mar. 28, 2012) at 452. When counsel again referenced the destroyed evidence, Mattson's counsel objected. APES's counsel responded that Mattson's counsel had opened the door. The trial court overruled the objection on that basis. VRP (March 28, 2012) at 468, 615-16.

During the presentation of evidence, APES's counsel asked Mattson how long it was after the accident that she spoke with counsel about filing suit. She answered that she had done so within six months, but admitted that she did not know if counsel had asked APES to preserve

33

their records. Mattson's counsel later sought a curative instruction outside the presence of the jury:

> [Mattson's counsel]: Your Honor, . . . I specifically objected – and I apologize, but I had to make numerous objections, because . . . [APES's counsel] went into when did you hire counsel and was it our firm. None of that questioning is appropriate. But it certainly wasn't appropriate in light of the fact that I made a specific motion and the Court ordered specifically that nothing going into the circumstances of hiring counsel would be discussed or would be prone to questioning. . . . It was a violation of the order in limine.
>
> [The Court]: [asking APES's counsel for his argument].
>
> [APES's counsel]: I'm sorry, Your Honor. I don't believe it was a violation of the order.
>
> I didn't ask about the circumstances surrounding it. All I asked about was the timing.
>
> . . . .
>
> [The Court]: That's how I read the order, too. I was aware of the order, but I didn't think it had to deal with the circumstances of hiring of counsel; circumstances were they brothers, were they cousins, did you know them from some other source, those kinds of things were the circumstances. What are the terms of your fee agreement. I read it, and I - -I read that exactly what I intended, which was those kind of circumstances are certainly not relevant to anything.

VRP (Apr. 2, 2012) at 916-19. The trial court denied Mattson's request for a curative instruction on the ground that there was no violation of the order in limine.

Again, the trial court specifically allowed APES to make the arguments and admit the evidence that Mattson now objects to. Even if we read the order in limine as forbidding evidence or argument about when Mattson first saw counsel, the trial court determined that Mattson opened the door to it, rendering the evidence admissible, with her argument that APES had destroyed evidence. *See State v. Young*, 158 Wn. App. 707, 719, 243 P.3d 172 (2010) (a party can open the door to the other party admitting otherwise inadmissible evidence). APES's counsel committed no misconduct.

D.    Closing Argument

Finally, Mattson alleges that a statement by APES's counsel during closing argument

requires a new trial.. We agree that APES's counsel committed misconduct but disagree that the

misconduct entitles Mattson to a new trial.

Closing arguments in this case apparently stretched on for some time, and the trial court

urged Mattson's counsel to wrap things up on several occasions.  After one of these admonitions,

the following exchange occurred:

> [Mattson's counsel]:  Let me just finish up, if I may, Your Honor.
> [Trial court]:          Quickly.
> [Mattson's counsel]:  The preponderance of the evidence in this
> case is, ladies and gentlemen, more probably true than not true that they
> dropped the oil and they caused this accident, and we're here asking you
> to finally, after nine years, assess full responsibility and accountability.
>     That's what we call atonement.  Atonement is not just to say I did
> it.  It's to take responsibility for it.  That's why we need you.
>     And you know, the last thing I'll show you, and I don't need to
> make – mean to make light of things, but –
> [APES's counsel]:  You know, I thought we were done here, Your
> Honor.  He's long past his time that you allotted both of us.
> [Mattson's counsel]:  Your Honor, he doesn't like my argument so
> he's trying to interrupt me.
>     Excuse me, if I may.
> [APES's counsel]:    I'm hungry.
> [Mattson's counsel]:  Too bad if you want to go.  This is important
> to my client, sir.

VRP (Apr. 4, 2012) at 1218-19.

APES's counsel committed misconduct when he stated, "I'm hungry." VRP (Apr. 4,

2012) at 1219.  The statement was, charitably viewed, unprofessional.  Mattson did not object,

however, and a curative instruction telling the jury to disregard the remark could have obviated

any prejudice it engendered.  Mattson's failure to object under those circumstances waives any

claim of error.  *Teter*, 174 Wn.2d at 226.  Further, the trial court found that the statement did not

35

prejudice Mattson such that it should grant her a new trial. Again, the trial court saw the exchange, as well as the jurors' reaction to it, first hand and we defer to its determinations for this reason. *Teter*, 174 Wn.2d at 223 (citing *Lord*, 117 Wn.2d at 887).

## V. JUROR MISCONDUCT

Mattson next seeks a new trial under CR 59(a)(1) because of alleged juror misconduct. Specifically she contends that the jury failed to follow the trial court's instructions about deliberations and that juror 10[7] failed to honestly answer questions during voir dire and then injected extrinsic evidence into deliberations. We review a trial court's determinations on the existence of juror misconduct and its prejudicial effect for an abuse of discretion. *Richards v. Overlake Hosp. Med. Ctr.*, 59 Wn. App. 266, 271, 796 P.2d 737 (1990). Under that standard, we find no error in the trial court's denial of Mattson's motion for a new trial based on these allegations.

Before voir dire, the court submitted Mattson's juror questionnaire to the venire. One of the questions asked potential jurors to disclose whether they "or someone close" to them had worked in any of the listed 10 fields. CP at 38. One of these fields was "law enforcement." CP at 38. Potential juror 19 filled out the questionnaire by stating that neither he nor anyone close to him had worked in any of the fields.

During voir dire, Mattson questioned two of the potential jurors who had disclosed a history of employment with law enforcement. One potential juror worked as an armed guard at Joint Base Lewis-McChord and had previously served as an air marshal. Mattson's counsel asked about the juror's experience in investigating accidents and determining fault. Another

---

[7] Juror 10 was designated as potential juror 19 before being seated. Thus, those references in this opinion are to the same person.

potential juror had worked as a community corrections officer. Again, Mattson's counsel asked about investigations the juror had performed within the scope of his employment.

APES's counsel later asked whether any of the potential jurors had "investigative experience as a private investigator, as a member of law enforcement, or as a military law enforcement, investigating a potential crime or accident, anything of that nature?" VRP (Mar. 27, 2012) at 365-66. Potential juror 19 did not respond.

Mattson's counsel did speak directly to potential juror 19 during voir dire. Mattson's counsel him if he had "[a]ny concerns . . . about any of the topics we've discussed here?" VRP (Mar. 28, 2012) at 421. Potential juror 19 stated that he did not. Given his answers, the parties did not challenge potential juror 19, and the trial court seated him as juror 10.

After the verdict, juror 6 signed a declaration alleging two different types of juror misconduct. First, juror 6 stated that the jurors had failed to follow the proper procedures for deliberating and voting on Mattson's claims. Second, juror 6 declared that juror 10 had failed to disclose his experience as an investigator for the Occupational Safety and Health Administration (OSHA) during voir dire. According to juror 6, during deliberations juror 10 discussed OSHA investigative standards and stated that he could not find APES or Stadtherr negligent because the investigation into Mattson's accident failed to comply with those standards. Based on the declaration from juror 6, Mattson moved for a new trial because of juror misconduct. The trial court denied Mattson's motion.

A party may obtain a new trial based on claims of juror misconduct. *State v. Balisok*, 123 Wn.2d 114, 117-18, 866 P.2d 631 (1994). A juror commits misconduct during voir dire by misrepresenting material facts or by failing to disclose material facts. *McCoy v. Kent Nursery,*

*Inc.*, 163 Wn. App. 744, 760, 260 P.3d 967 (2011) (citing *Robinson v. Safeway Stores, Inc.*, 113 Wn.2d 154, 158, 776 P.2d 676 (1989)). To obtain a new trial for such misconduct, a party must show "that [the] juror 'failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.'" *McCoy*, 163 Wn. App. at 761 (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555-56, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984) and (citing *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 267, 172 P.3d 335 (2007)).

A juror may also commit misconduct by injecting extrinsic evidence into jury deliberations. *Balisok*, 123 Wn.2d at 118. If a juror does so, a trial court may grant a new trial if the losing party makes a "'strong affirmative showing of misconduct'" that overcomes the policy considerations protecting secret jury deliberations. *Breckenridge v. Valley Gen. Hosp.*, 150 Wn.2d 197, 203, 75 P.3d 944 (2003) (quoting *Balisok*, 123 Wn.2d at 117-18).

Because of the interest in "'secret, frank and free discussion of the evidence by the jury'" "appellate courts will generally not inquire into the internal processes by which the jury reaches its verdict." *Breckenridge*, 150 Wn.2d at 203-04 (quoting *Balisok*, 123 Wn.2d at 117-18). These "'individual or collective thought processes leading to a verdict "inhere in the verdict" and cannot be used to impeach a jury verdict.'" *Breckenridge*, 150 Wn.2d at 204-05 (quoting *State v. Ng*, 110 Wn.2d 32, 43, 750 P.2d 632 (1988)). To test whether post-verdict statements from a juror alleging misconduct concern matters inhering in the verdict, we look to whether the statements relate to "[t]he mental processes by which individual jurors reached their respective conclusions, their motives in arriving at their verdicts, the effect the evidence may have had upon the jurors or the weight particular jurors may have given to particular evidence, or the jurors'

38

intentions and beliefs." *Cox v. Charles Wright Acad., Inc.*, 70 Wn.2d 173, 179-80, 422 P.2d 515 (1967). Alternatively, we look to "'whether that to which the juror testifies can be rebutted by other testimony without probing the juror's mental processes.'" *Breckenridge*, 150 Wn.2d at 205 (quoting *Gardner v. Malone*, 60 Wn.2d 836, 841, 376 P.2d 651 (1962)).

We now turn to the merits of Mattson's allegations, mindful that we analyze the question of whether the matters she alleges inhere in the verdict separately from the question of whether there was juror misconduct. *Breckenridge*, 150 Wn.2d at 204 n.12.

A.    Failure to Follow the Jury Instructions

Mattson first alleges the jury as a whole improperly failed to follow the trial court's procedural instructions for reaching a verdict. The jury's procedures for reaching its verdict, such as how it went about voting, inhere in the verdict and a party cannot impeach the verdict based on these matters. *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 768-70, 818 P.2d 1337 (1991). We therefore cannot consider juror 6's declaration as it relates to this allegation of juror misconduct. Without the declaration, Mattson can offer no evidence of any misconduct. Given this lack of evidence, the trial court did not abuse its discretion in denying the motion for a new trial.

B.    Failure to Disclose Employment History During Voir Dire

Mattson next alleges that juror 10 failed to properly disclose his experience working for OSHA during voir dire. Because Mattson could prove juror 10's previous employment as an OSHA inspector using testimony unconnected with the jury deliberations, this employment history does not inhere in the verdict.

We do not, however, agree with Mattson that the juror failed to honestly answer questions during voir dire. Mattson's jury questionnaire asked about past employment in "law enforcement." The courts have differed wildly about whether OSHA employees work in law enforcement. *Compare Matsko v. United States*, 372 F.3d 556, 560 (3d Cir. 2004) (administrative investigators are not law enforcement personnel for purposes of the federal tort claims act "no matter what investigative conduct they are involved in") *with Ortloff v. United States*, 335 F.3d 652, 659 (7th Cir. 2003) (including OSHA employees among the "potential number of federal law enforcement officials in our modern government's alphabet soup"), *overruled on other grounds by Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 128 S. Ct. 831, 169 L. Ed. 2d 680 (2008). Since the courts cannot decide if an OSHA employee is a law enforcement official, we decline to find misconduct in a former OSHA employee's failure to identify himself as having worked in law enforcement. As APES argues, people commonly understand the term "law enforcement" to mean those agencies or persons sworn to uphold the state's laws and empowered to arrest people for violations of those laws. Juror 10 did not work in that capacity and did not commit misconduct in answering his questionnaire to this effect.

Mattson contends that, even if juror 10's answers to the jury questionnaire did not omit material information, other questions in voir dire should have caused him to disclose his employment with OSHA. Other jurors did disclose law enforcement experience and Mattson's and APES's counsel asked them and others about their experience in investigating accidents, crimes, and determining fault. Later, Mattson's counsel asked juror 10 if he had "[a]ny concerns . . . about any of the topics we've discussed here?" VRP (Mar. 28, 2012) at 421. Mattson contends that these questions required juror 10 to disclose his investigative experience. Mattson

asked juror 10, however, about "concerns" he had with the topics covered in voir dire. Various courts have suggested that a juror does not commit misconduct within the meaning of the *McDonough* test[8] by failing to give the answer the asking party is looking for with a vague question. *E.g.*, *Hatten v. Quarterman*, 570 F.3d 595, 602 (5th Cir. 2009) (juror does not commit misconduct by failing to answer that he had a "problem" with drugs when "problem" is ambiguous enough that it could refer, not to addiction, but to an "allergy or an aversion"); *State v. Chesnel*, 734 A.2d 1131, 1140-41 (Me. 1999) (finding no misleading answer in voir dire because of the vagueness of the question). Juror 10 could have had no "concerns" with those topics, meaning no worry or fear, and answered the question honestly and correctly even if we assume he had law enforcement experience. The vagueness of Mattson's question prevents finding misconduct.

C.     Introduction of Extrinsic Evidence During Jury Deliberations

Mattson alleges that juror 10 committed further misconduct by discussing OSHA's investigative standards during deliberation. The statements from juror 6 that Mattson cites explain the way that juror 10 weighed the evidence Mattson offered and why he voted as he did. These matters inhere in the verdict, and Mattson may not use this evidence to show juror misconduct. *Breckenridge*, 150 Wn.2d at 204-07; *Cox*, 70 Wn.2d at 176-80; *McCoy*, 163 Wn. App. at 767-68. The trial court did not abuse its discretion in denying Mattson's motion for a new trial.

---

[8] *McDonough Power Equip.*, 464 U.S. at 548.

## VI. CUMULATIVE ERROR/SUBSTANTIAL JUSTICE

Finally, Mattson seeks a new trial, either based on cumulative error or because the jury verdict failed to do substantial justice. We deny Mattson's request for a new trial on these grounds.

The doctrine of cumulative error recognizes that multiple errors might combine to deny a litigant a fair trial, even where each individual error does not prejudice the litigant in isolation. *State v. Davis*, 175 Wn.2d 287, 345, 290 P.3d 43 (2012); *Storey v. Storey*, 21 Wn. App. 370, 374, 585 P.2d 183 (1978) (applying cumulative error in the civil context). But even where multiple errors occur, we need not reverse on cumulative error if the errors "were not so egregious or unduly prejudicial that they denied" the litigant a fair trial. *Davis*, 175 Wn.2d at 345. Here, at most the record contains some nonprejudicial errors related to counsel misconduct. These errors do not combine to suggest that Mattson did not receive a fair trial.

Mattson also seeks a new trial because "substantial justice has not been done." CR 59(1)(9). She cites *Snyder v. Sotta*, 3 Wn. App. 190, 473 P.2d 213 (1970), and claims that it holds that a high level of rancor at trial warrants a new trial under CR 59(a)(7). *Snyder*'s holding provides little support for Mattson. In *Snyder*, the trial court made extensive findings about the multiple ways the parties' bitterness pervaded the trial and infected the jury, preventing both sides from having a fair trial. 3 Wn. App. at 195-98. Based on these findings, the trial court ordered a new trial. *See Snyder*, 3 Wn. App. at 195. Division Three of our court affirmed the grant of a new trial under former CR 59(f), which allowed new trials for failure to do substantial justice, because the trial court was best situated to determine the effect of the rancorous atmosphere on the parties' rights to a fair trial. *Snyder*, 3 Wn. App. at 191, 198-99. Here, the

42

No. 43735-0-II

trial court explicitly found that the heated atmosphere at trial did not prejudice the parties to a degree warranting a new trial. *Snyder* requires that we defer to that determination.

CONCLUSION

We find substantial evidence in the record to support the jury's verdict. We therefore hold that the trial court properly denied Mattson's motions for judgment as a matter of law under CR 50 and for a new trial under CR 59. We hold that the trial court did not err in declining to preclude or estop APES and Stadtherr from disputing causation on remand. We also hold that the trial court did not err in instructing the jury. Finally, we find no basis for concluding that the trial court abused its discretion in declining to order a new trial based on any counsel or juror misconduct or for cumulative error or a failure to do substantial justice. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Bjorgen, A.C.J._
BJORGEN, A.C.J.

We concur:

_Hunt, J._
HUNT, J.

_Maxa, J._
MAXA, J.

43